**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Cynthia J. Backman,

                       Plaintiff,

                                                       Civ. No. 04-3175 (RHK/JSM)
v.                                                   **MEMORANDUM OPINION**
                                                   **AND ORDER**

United States Postal Service and
John Potter, Post Master General,

                       Defendants.

Gregg M. Corwin and Jennifer J. Duchscherer of Gregg Corwin & Associates Law Office, Saint Louis Park, Minnesota, for Plaintiff.

Mary Jo Madigan, Assistant U.S. Attorney, Minneapolis, Minnesota, for Defendant.

**INTRODUCTION**

In this employment discrimination case, Plaintiff Cynthia Backman ("Backman") alleges that her former employer, Defendant United States Postal Service ("USPS"), unlawfully terminated her employment based on her gender and in retaliation for her engaging in two protected activities. In its Motion for Summary Judgment, USPS argues that Backman's employment was terminated because she violated USPS policies. For the reasons set forth below, the Court will grant USPS's motion.

**BACKGROUND**

Backman began working for USPS in 1978 when she was hired as a part-time flexible postal clerk in Garden City, Minnesota. (Backman Aff. ¶ 1.) During the next twenty years, she became a full-time postal employee and worked in various departments of the post office located in Mankato, Minnesota. (Id.) Throughout her Postal Service career, Backman consistently received satisfactory or excellent overall ratings on her performance reviews. (Duchscherer Aff. Ex. 9.) In 1996, Backman was transferred to the Bulk Mail Entry Unit ("BMEU") within the Mankato Post Office, where she was appointed to the position of a Bulk Mail Technician. (Backman Aff. ¶ 3.)

As a Bulk Mail Technician, her duties included verifying funds paid for bulk mail permits, assessing proper sorting procedures for bulk mail, weighing individual pieces of mail for proper postage requirements, and collecting payment for bulk mail transactions. (Backman Aff. ¶ 4.) To complete a bulk mailing transaction, Backman went through a series of steps: (1) assessing a customer's USPS form brought in with the bulk mailing to ensure proper sorting, weight and number of mail pieces, (2) creating, signing and dating a postal form, (3) collecting or verifying payment for the bulk mailing, and (4) attaching a neon sign labeled "cleared" to the bulk mailing and placing the mailing in a container to alert the mail processor that the bulk mailing was ready to go out to the main post office floor. (Backman Aff. ¶ 15.) Backman processed approximately twenty bulk mailings a day, five days a week. (Backman Aff. ¶ 4.)

Bulk mail customers are required to pay an annual fee in order to maintain a bulk mail permit. (Backman Aff. ¶ 8.) Each bulk mail permit has a corresponding trust account,

into which a customer can deposit money at any time. (Backman Aff. ¶ 9.) Some customers make these deposits before bringing bulk mailings to the post office, and some pay for the bulk mailing at each visit to the post office. (Id.) When she started working at the BMEU, Backman discovered that unpaid or partially paid bulk mailings were sometimes processed by the post office. (Backman Dep. Tr. at 10.) Although Backman received some training when she was transferred to the bulk mailing department, she was never given formal training on how to process bulk mail orders with insufficient payment. (Backman Aff. ¶ 5.) When Backman started working in the department, two co-workers in the BMEU informed her that any customer who did not pay for a bulk mailing at the time of delivery should be called for collection. (Backman Aff. ¶ 6.)

For several years during her employment, Backman was an active leader of the Postal Workers Union, where her duties included helping other members file grievances against USPS. (Backman Aff. ¶ 2.) Specifically relevant to this case are two situations where Backman opposed employment practices by USPS. In 1994, she testified against USPS in an employment discrimination case brought by another postal worker. (Backman Aff. ¶ 22.) Then in 1997, she filed an Equal Employment Opportunity ("EEO") Complaint against USPS for discrimination. (Backman Aff. ¶ 2.)

While working in the BMEU, Backman processed bulk mailings for Rhonda Callahan ("Callahan"). Backman first met Callahan in the mid-1980s when both were working for USPS. (Backman Dep. Tr. at 8.) In 1994, Backman testified as a witness in Callahan's employment discrimination lawsuit against USPS. (Id. at 27-28.) Although

3

Callahan no longer works at USPS, the two remain friends. (Backman Dep. Tr. at 9.) Callahan owns a small business, Galilee Inc., and conducts a few bulk mailings per year through the BMEU. (Id. at 30.)

On May 24, 2001, Backman accepted and processed a bulk mailing from Callahan without receiving the required payment of $1,353.48. (USPS Ex. 14.) Backman has no recollection of the transaction. (Backman Aff. ¶ 6.) One year later, on May 24, 2002, Callahan brought another bulk mailing to the BMEU. (Backman Aff. ¶ 14.) After Backman verified the bulk mailing, Callahan informed Backman that she had forgotten her purse and would return with payment. (Id.) Backman set the bulk mailing aside without completing the processing form or attaching a "cleared" sign to it, and took her lunch break. (Id.) When Backman returned from lunch, she learned that Callahan's bulk mailing had been processed even though Callahan had not returned to the BMEU with proper payment. (Backman Aff. ¶ 17.) Backman called Callahan twice requesting payment, but received none. (Id.)

On July 22, 2002, Backman was given notice by USPS that her employment was terminated as of August 31, 2002. (USPS Ex. 14.) Her notice of termination gave details of an investigation into the May 24, 2001 and May 24, 2002, transactions involving Callahan. (Id.) USPS inspectors determined that the two transactions constituted

violations of postal service regulations 661.3[1], 661.53[2], 666.1[3], and 666.2[4], and were grounds for termination of Backman's employment. (Id.)

On June 18, 2003, both Backman and Callahan were charged in Blue Earth County with two counts of Aiding and Abetting Felony Theft for the May 24, 2001, and May 24, 2002, unpaid bulk mailings. (USPS Ex. 16.) Both cases were continued one year for dismissal. (USPS Ex. 17.) Callahan paid for the May 24, 2002, mailing and was ordered to make restitution for the May 24, 2001, mailing. (Id.)

After her termination, Backman filed a union grievance. Upon the completion of arbitration proceedings, Backman's grievance was denied. (USPS Ex. 15.) In reaching this conclusion, the Arbitrator noted:

> the intentional failure to collect postage that is due on a bulk mailing, not once b[ut] twice from a friend, need not be treated any differently from an intentional conversion of Postal funds to one's own account. It has long been recognized by scores of Postal Service Arbitrators that any intentional

---

[1] Regulation 661.3 provides: "Employees must avoid any action, whether or not specifically prohibited by this Code, which might result in or create the appearance of: (b) giving preferential treatment to any person." (USPS Ex. 14.)

[2] Regulation 661.53 provides: "No employee will engage in criminal, dishonest, notoriously disgraceful or immoral conduct, or other conduct prejudicial to the Postal Service. Conviction of a violation or any criminal statute may be grounds for disciplinary action by the Postal Service, in addition to any other penalty by or pursuant to statute." (USPS Ex. 14.)

[3] Regulation 666.1 provides: "Employees are expected to, discharge their assigned duties conscientiously and effectively." (USPS Ex. 14.)

[4] Regulation 666.2 provides: "Employees are expected to be loyal to the government and uphold the policies of the Postal Service." (USPS Ex. 14.)

5

> conversion of Postal Service funds to one's own benefit, even a minimal conversion, is ground for removal, even for a first offense.

(Id.) Subsequently, Backman commenced this litigation alleging claims of employment discrimination based on gender and retaliation. (Compl. at 2-4.)

In its Motion for Summary Judgment, USPS argues that Backman cannot meet her burden to establish an inference of gender-motivated discrimination under the McDonnell-Douglas test. (Mem. in Supp. at 10-16.) Specifically, USPS contends the evidence offered by Backman does not overcome the rigorous burden in the pretext phase of the McDonnell-Douglas test to show that she was treated differently than similarly situated male USPS employees. (Mem. in Supp. at 12-14.) With respect to Backman's retaliation claim, USPS argues the extended time lapse between Backman's protected activities in 1994 and 1997, and her July 22, 2002, termination negates any inference of causation and, without more, her retaliation claim fails. (Mem. in Supp. at 16-18.)

## STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp, 475 U.S. 574, 586-87 (1986). Upon motion for summary judgment,

the moving party carries the burden of showing there is no genuine issue of material fact, and all evidence and reasonable inferences must be viewed in a light most favorable to the non-moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

**ANALYSIS**

Backman alleges two separate claims under Title VII of the Civil Rights Act. First, she claims gender discrimination in violation of 42 U.S.C. § 2000e-2(a)(1). Second, she claims USPS terminated her employment in retaliation for her 1994 testimony and her 1997 EEO complaint, both protected activities under 42 U.S.C. § 2000e-3(a).

**I.  Disparate treatment claim**

Title VII makes it unlawful for an employer to discriminate against an employee on the basis of race, national origin, religion or gender. 42 U.S.C. § 2000e-2(a)(1). Because she has not presented direct evidence of discrimination, Backman proceeds under the McDonnell Douglas three-part burden-shifting framework. Under McDonnell Douglas, Backman must first establish a prima facie case of discrimination. See Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1156 (8th Cir. 1999). If she demonstrates a prima facie case, the burden shifts to USPS to demonstrate a legitimate, non-discriminatory reason for the adverse employment action. Id. If USPS articulates such a reason, the burden shifts back to Backman to demonstrate that the stated reason is pretextual and the real reason was unlawful gender discrimination. Id. at 1157. At all times, Backman retains the ultimate burden of persuading the trier of fact that the adverse employment action was

motivated by intentional discrimination. See Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 143 (2000).

### A. Prima facie case

Backman must first establish a prima facie case of discrimination. To accomplish this, she must demonstrate that (1) she is a member of a protected group, (2) she was qualified for the position and was meeting her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) circumstances exist which give rise to an inference of discrimination. Wheeler v. Aventis Pharm., 360 F.3d 853, 857 (8th Cir. 2004).

USPS argues that Backman cannot show the second element of a prima facie case of gender discrimination - that she was meeting the legitimate expectations of USPS. To analyze this element, the Court must look not only at Ms Backman's ability to perform her job at the BMEU, but also at whether she was actually performing her job at a level that met USPS's legitimate expectations. Whitley v. Peer Review Sys. Inc., 221 F.3d 1053, 1055 (8th Cir. 2000). USPS asserts that Backman was "clearly not meeting the legitimate expectations of the Postal Service when she processed mail free for a friend." (Mem. in Supp. at 11.) According to USPS performance review documentation from 2000 and 2001, however, Backman received satisfactory and outstanding overall reviews for her work performance at the post office. (USPS Ex. 9.) It was not until USPS commenced an investigation in June 2002 that it discovered Backman's unpaid bulk mailing transactions with Callahan. (USPS Ex. 8-13.) Based on this discovery, USPS terminated Backman's

employment. (USPS Ex. 14.) Prior to the discovery of unpaid bulk mailing transactions, Backman was meeting the legitimate expectations of USPS.

USPS also argues that Backman cannot show the fourth element of a prima facie case of discrimination - that circumstances exist which give rise to an inference of discrimination. Backman has presented evidence tending to show that similarly situated male employees at USPS were treated more favorably than her. Although USPS contends that the burden to show evidence of similarly situated employees is "rigorous" at this stage (Mem. in Supp. 13-14), the test to determine if one is "similarly situated" at the prima facie stage is "not onerous." Rodgers v. U.S. Bank, 417 F.3d 845, 852 (8th. Cir. 2005) ("Using a more rigorous standard at the prima facie stage would conflate the prima facie case with the ultimate issue of discrimination, thereby effectively eliminating the burden-shifting framework the Supreme Court has directed us to use.") To meet this lesser burden, Backman must show that she and other male employees at USPS were "involved in or accused of the same or similar conduct and were disciplined in different ways." Wheeler, 360 F.3d at 857.

Backman offers evidence of several situations where male co-workers were not disciplined for processing unpaid bulk mailings. (Mem. in Opp'n at 15-17.) For example, a commercial customer (Paragon), called the post office to alert workers that an unpaid bulk mailing had occurred several weeks earlier. (Backman Aff. ¶ 8.) It was discovered that one of Backman's male co-workers, Todd Abild, never verified payment through the trust account before processing the mailing. (Id.) Another male co-worker in the BMEU,

Richard Karnopp, processed a bulk mailing for a commercial customer (Four Flags) without verifying documentation and payment. (Backman Aff. ¶ 8.) Mr. Karnopp called for and received verification two weeks later. (Id.) Richard Karnopp also processed a bulk mailing for Mankato State University even though its bulk mail permit had expired. (Backman Aff. ¶ 8.) Viewing this evidence in a light most favorable to Backman, she has satisfied the low threshold requirement at this preliminary stage to show an inference of discrimination, and has established a prima facie case.

### B. Legitimate, Nondiscriminatory Reason

Because Backman has established a prima facie case of disparate treatment, the burden shifts to USPS to articulate a legitimate, nondiscriminatory reason for terminating Backman's employment. USPS asserts that it terminated Backman's employment based on her violations of postal service regulations. (Mem. in Supp. at 15.) USPS inspectors determined the two bulk mailing transactions conducted by Backman for Callahan on May 24, 2001, and May, 24, 2002, constituted violations of postal service regulations 661.3, 661.53, 666.1 and 666.2. (USPS Ex. 14.) Violation of company policy is a legitimate, nondiscriminatory reason for termination. See Kiel v. Select Artificial, Inc., 169 F.3d 1131, 1135 (8th Cir. 1999) (en banc). Backman does not dispute that USPS has met its burden on this point.

### C. Pretext

Having produced a legitimate, nondiscriminatory reason for terminating Backman's employment, USPS has shifted the burden back to Backman to show that the proffered

reasons are pretextual and the real reason for termination of her employment was unlawful gender discrimination. See Breeding, 164 F.3d at 1157. Backman attempts to prove pretext on three grounds: (1) she was subject to less favorable treatment than similarly situated male employees, (2) USPS does not have a written rule specifically prohibiting the processing of unpaid bulk mailings, and (3) she did not actually engage in the conduct used as grounds for her termination.

### 1. Similarly Situated Male Employees at USPS

First, Backman argues pretext can be established by showing she was treated less favorably than similarly situated male employees at the BMEU. At the pretext stage of the McDonnell Douglas burden-shifting framework for a disparate treatment claim, the test for determining whether employees are similarly situated is a "rigorous one." Rodgers, 417 F.3d at 845. Specifically, Backman must point to other employees who "have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct *without any mitigating or distinguishing circumstances*." Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000) (citing Lynn v. Deaconess Med. Ctr.- W. Campus, 160 F.3d 487, 488 (8th Cir. 1998) (emphasis added)).

Backman has not offered sufficient evidence to raise genuine issues of material fact to satisfy this rigorous standard. First, Clark requires a showing that Backman "dealt with the same supervisors" as similarly situated male USPS employees. 218 F.3d at 918. Backman does not specifically point to which supervisor dealt with her unpaid bulk mail transactions with Callahan on May 24, 2001, and May 24, 2002. She only mentions that

11

Manager Brent Woodfill was involved in the decision to terminate her employment.[5] (Mem. in Opp'n at 20.) Thus, Backman has failed to present sufficient evidence to show that she and similarly situated male employees dealt with the same supervisors.

Clark also requires a showing that Backman "engaged in the same conduct without any mitigating or distinguishing circumstances." 218 F.3d at 918. Distinguishing circumstances set Backman's conduct apart from the conduct of similarly situated male USPS employees. The first distinguishing circumstance is Backman's personal relationship and past involvement with Callahan. Backman admits that she has a continuing social relationship with Rhonda Callahan. (Pl. Dep. Tr. at 8-9, 27-28.) Backman also admits that she has used Callahan's bulk mail permit for her own business. (Backman Aff. ¶ 23.)

The second distinguishing circumstance is the difference between the size of Callahan's two unpaid bulk mailing transactions and other transactions cited by Backman. Another employee at the BMEU, Richard Karnopp, testified in his deposition that processing large unpaid bulk mailings from frequent customers at the BMEU was often allowed because payment was easy to acquire. (Duchscherer Aff. Ex. 3.) The unpaid bulk mailings processed cited by Backman in support of her claim include large corporate

---

[5] Backman's examples of unpaid bulk mailings being processed by similarly situated male USPS employees involve Postmaster Jim Kirschbaum (Backman Aff. ¶¶ 11-12), direct supervisor Mr. Garms (Pl. Ex. 8), direct downtown supervisor Pete Sterling (Backman Aff. ¶ 10), manager Anthony Kozitza (Backman Aff. at 7), or no reference to a supervisor at all (Backman Aff. ¶ 8).

customers at the BMEU, such as Paragon, Four Flags, Mankato State University, Thayer Inc., and Free Press. (Backman Aff. ¶¶ 8, 11-12.) The two unpaid bulk mailings Backman processed for Callahan were small in size (averaging $1,000) and infrequent as compared to larger companies who frequently used the BMEU to complete extensive transactions ($30,000 and above).

Finally, it is worth noting that Backman was charged by the Blue Earth County Attorney for two counts of Aiding and Abetting Felony Theft in connection with Callahan's unpaid bulk mailing transactions. (USPS Ex. 16.) Although the case was continued for a year and then dismissed, a thorough investigation was conducted by the Blue Earth County Attorney, including interviews with several USPS employees. (Id.) This clearly sets Backman's conduct apart from the conduct of other employees at USPS who processed unpaid bulk mailings.

Based on these distinguishing factors, Backman cannot be considered similarly situated to other employees in the BMEU in light of the "rigorous" standard required under Rodgers.

### 2. Lack of a Specific Rule Prohibiting Conduct

Second, Backman argues pretext is shown because USPS terminated her employment based on an unwritten rule prohibiting unpaid bulk mailings. (Mem. in Supp. at 20.) Although USPS has not presented evidence of a specific regulation prohibiting the processing of unpaid bulk mail, it argues that the regulations cited in Backman's notice of removal cover her conduct at the BMEU. (USPS Ex. 14.) Postal Service Regulation 661.3

13

prohibits employees from "giving preferential treatment to any person." (Id.) Postal Service Regulation 661.53 prohibits employees from "engaging in criminal, dishonest, notoriously disgraceful or immoral conduct." (Id.) In disparate treatment actions, courts have not necessarily found discriminatory intent on the part of employers who use broad company policies to terminate employees for specific misconduct. See Kiel v. Select Artificial Inc., 169 F.3d 1131, 1135 (8th Cir. 1999) (citing Ward v. Procter & Gamble Paper Prods. Co., 111 F.3d 558, 560 (8th Cir. 1997) (employee terminated for striking a co-worker); Lidge-Myrtil v. Deere & Co., 49 F.3d 1308, 1310-11 (8th Cir. 1995) (employee not chosen for promotion based on poor relationship with co-workers and violation of company policy). The Court determines that the regulations cited by USPS were violated by Backman's conduct. Therefore, the lack of a rule specifically barring an employee from processing unpaid bulk mail orders does not show pretext on the part of USPS.

### 3. Failure to Engage in Prohibited Conduct

Third, Backman argues pretext is shown because USPS terminated her employment based on conduct she never actually engaged in. (Mem. in Opp'n at 23.) In Backman's notice of removal, USPS cited the reason for termination as specifically "entering permit mail without payment of postage" on May 24, 2001, and May 24, 2002. (Duchscherer Aff. Ex. 14.) Backman admits she accepted the unpaid bulk mailing from Callahan at the post office, but denies she processed the mailing. (Backman Aff. ¶ 14.) This argument focuses on the wrong question. The key question is not whether Backman actually processed the

14

bulk mailing, but whether USPS really *believed* that she processed the mailing. Hitt v. Harsco Corp., 356 F.3d 920, 924 (8th Cir. 2004). In this case, USPS inspectors conducted an investigation and concluded that Backman did process two unpaid bulk mailings for Rhonda Callahan. (Duchscherer Aff. Ex. 8-14.) Based on the investigation conducted by USPS, the Court finds that USPS did believe that Backman processed two unpaid bulk mailings. Therefore, no pretext is shown.

### D. Conclusion

Due to Backman's failure to present evidence creating a genuine issue of material fact at the pretext stage of the McDonnell-Douglas burden-shifting framework for a disparate treatment claim, summary judgment on that claim is appropriate.

## II. Retaliation claim

Backman's has also brought a claim for retaliation. Under Title VII, it is unlawful for an employer to intentionally discriminate against an employee because he or she opposes employment practices. See 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, Backman must show: (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) a causal connection between the protected activity and the adverse employment action. Sowell v. Alumnia Ceramics, Inc., 251 F.3d 678, 693 (8th Cir. 2001). USPS does not contest that Backman is able to show the first two elements - that she engaged in protected conduct by testifying against USPS in 1994 and filing an EEO Complaint in 1997, and that she suffered an adverse employment action when her employment was subsequently terminated by USPS. However, USPS

argues that Backman cannot establish a causal connection between her protected conduct in 1994 and 1997, and the termination of her employment on August 31, 2002.

For the purposes of a motion for summary judgment, more than a temporal connection is needed to establish a genuine issue of material fact on a retaliation claim. Kiel v. Select Artificial Inc., 169 U.S. 1131, 1136 (8th Cir. 1999). A mere coincidence of timing can rarely be sufficient to overcome summary judgment on a claim of retaliatory discharge. Kipp v. Mo. Highway Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002). In this case, USPS argues that a lapse of more than five years between the protected activities and the adverse employment action is clearly insufficient temporal proximity to establish a causal connection. (Mem. in Supp. at 16-18.) See Kipp, 280 F.3d at 897 (interval of two months between complaint and termination is too diluted to create the necessary temporal proximity for a causal connection in a retaliation claim); Gagnon v. Sprint Corp., 284 F.3d 839, 851-52 (8th Cir. 2002) (a one month lapse between an EEOC claim and adverse employment action is not enough).

Backman cites Sims v. Sauer-Sundstrand Co. in support of her proposition that "the passage of time between events does not by itself foreclose a claim of retaliation." 130 F.3d 341, 343 (8th Cir. 1997) (citing Smith v. St. Louis University, 109 F.3d 1261, 1266 (8th Cir. 1997)). She argues that the Court should also look to background facts to find a causal connection. (Mem. in Opp'n at 28.) Backman was an active leader of the Postal Workers Union for many years, where her duties included helping other members file grievances against USPS. (Backman Aff. ¶ 2.) In 1994, Backman testified against USPS in

a discrimination case brought by Rhonda Callahan.  (Backman Aff. ¶ 22.)  Several years later, when Callahan began conducting bulk mailing transactions for her company at the BMEU, Post Master Jim Kirschbaum told Manager Pete Sterling to let BMEU workers know that Callahan was prohibited on postal property.  (Id.)  Backman confronted Mr. Sterling and told him that Callahan should be allowed to conduct business at the post office.  (Id.)  In 1997, Backman filed her own EEO Complaint against USPS.  (Id.)

Sims, the case cited by Backman as support for her proposition that the Court should look to background facts to establish a causal connection, acknowledges Smith v. St. Louis University as its ultimate authority.  In Smith, a female resident at St. Louis University's Hospital and Medical School alleged retaliation because her supervisor gave a negative reference six months after she reported his inappropriate conduct to university officials.  109 F.3d at 1263.  The district court granted the University's summary judgment motion on several grounds, including its determination that the six-month time lapse was not sufficient to establish a causal connection.  Id. at 1264.  The Eighth Circuit reversed, noting that "the passage of time between events does not by itself foreclose a claim of retaliation; rather, it weakens the inference of discrimination that arises when a retaliatory act occurs shortly after a complaint."  Id. at 1266.  The Court determined that the plaintiff's weak showing of temporal proximity between the protected activity and adverse employment action was cured by the plaintiff's substantial evidence of retaliatory intent.  Id.

Like Smith, an extended time lapse between the last instance of protected activity and the adverse employment action "weakens the inference" of retaliatory intent in this

17

case. As compared to the six-month time lapse in Smith, the inference of retaliation in this case is weakened even further because of the five-year time lapse. Unlike Smith, Backman fails to cure the weak showing of temporal activity with substantial evidence of retaliatory intent. She has not presented evidence raising a genuine issue of material fact regarding whether management at the BMEU retaliated against her when making its decision to terminate her employment. Accordingly, Backman has failed to establish a causal connection between her protected activity and USPS's decision to terminate her employment. Summary judgment for USPS on this claim is appropriate.

## CONCLUSION

Based on the foregoing, and all of the files, records and proceedings herein, it is **ORDERED** that Defendant United States Postal Service's Motion for Summary Judgment (Doc. No. 20) is **GRANTED** and Plaintiff's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

Dated: October 3, 2005                              s/Richard H. Kyle
                                                    RICHARD H. KYLE
                                                    United States District Judge